Mrs. F. Y. Cooper and Florence Cooper, Appellants, v. Safeway Lines, Inc., et al., Appellees.

Gen. No. 40,497.

Heard in the second division of this court for the first district at the December term, 1938.

Opinion filed April 2, 1940.

HENRY MITGANG, of Chicago, for appellants; JOSEPH G. ROBINSON, of Chicago, of counsel.

ANSON H. BROWN, of Chicago, for certain appellees.

MR. PRESIDING JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

Plaintiffs, Mrs. F. Y. Cooper and her daughter, Florence Cooper, brought this action against Santa Fe Trails of Illinois, Inc., and Blue Motor Coach Lines (hereinafter for convenience referred to as defendants), and Emma Ronell (hereinafter designated as the codefendant), to recover damages for personal injuries sustained in a collision between a bus operated by defendants and an automobile operated by codefendant, while plaintiffs were riding as passengers in defendants' bus. Upon the trial the jury returned a verdict finding defendants guilty as to plaintiff Mrs. F. Y. Cooper and assessed her damages at $12,000. The jury also returned a verdict finding defendants guilty as to plaintiff Florence Cooper and assessed her damages at $1,000. The jury returned a verdict finding codefendant Emma Ronell not guilty. The trial court denied defendants' motions for a directed verdict, both at the close of plaintiffs' evidence and at the close of all the evidence, but after the verdicts had been returned in favor of plaintiffs and against defendants, the court entered judgment *non obstante veredicto* in favor of defendants and against plaintiffs. This appeal by plaintiffs followed. No question is raised on the pleadings. The cause was dismissed as to certain other defendants.

Plaintiffs' contentions as stated in their brief are: "That on the 30th day of June, 1935, in the night time, they were riding as passengers for hire in a passenger bus, owned and operated by the defendants, Santa Fe Trails of Illinois, Inc., a corp., and Blue Motor Coach Lines, a corp., as common carriers. They were on their way from New York City to Los Angeles, California. The bus was proceeding in a southerly direction on U. S. Highway No. 66, about six miles from Dwight, Illinois, at the hour of about 11:30 P. M. when a violent collision occurred between the bus and an

automobile proceeding in a northerly direction on said highway. That the impact between the two vehicles was caused through the negligence of the driver of the bus or through the negligence of the driver of the automobile, or both. That the plaintiffs were innocent victims of said negligence. That said plaintiffs were at all times in the exercise of due care and caution for their own personal safety. That said defendants, as common carriers, failed in their duty to exercise the highest degree of care and caution to avoid injuring said plaintiffs who were passengers on their bus. That as a consequence of this accident, the plaintiffs suffered serious permanent injuries.''

Defendants contend that they were not guilty of negligence at the time and place of the accident and that the collision occurred through the sole negligence of the codefendant. The codefendant contended in the trial court that she was not guilty of negligence at the time and place of the accident and that the collision occurred through the sole negligence of the driver of defendants' bus.

For a proper understanding and consideration of the questions presented it is necessary to set forth the testimony of the witnesses somewhat fully. Plaintiff Florence Cooper testified that she and her mother were being transported as passengers for hire upon a bus operated by defendants as common carriers; that they were en route from New York city to Los Angeles, California; that the bus was being operated by a servant of defendants; that plaintiffs occupied seats in said bus provided by the defendants for passengers; that the bus was proceeding south on U. S. Highway No. 66 at a speed of about 50 miles an hour; that it was traveling over the center line, with ''most'' of its body on the left side of the highway, and had been proceeding in this manner for about three-quarters of an hour before the accident; that prior to the collision an automobile traveling south on the highway had overtaken

the bus and passed it on its right; that the bus continued with its left front and rear wheels over the center line, on the east side of the highway without diminishing its speed; that it collided in a violent impact with the northbound automobile of the codefendant; that just before the impact the bus swerved to the left; that the north bound automobile of the codefendant was at all times in its proper lane of travel on the east side of the road; and that both vehicles came to rest after the collision on the east side of the highway.

Roscoe Cable, the driver of defendants' bus, who was called as a witness for plaintiffs, ostensibly for the purpose of making out a prima facie case of negligence against the codefendant, testified on direct examination that he was the driver of the bus involved in the accident; that he saw the northbound automobile with which he collided ''about one hundred and fifty feet ahead of me'' before the collision occurred; that he continued to watch that automobile; that ''when I first seen the automobile coming down the road it seemed to swerve to the right side of the highway into the ditch and then back across in front of the path of the bus''; and that the automobile went ''about two-thirds across'' the west side of the pavement and collided with the bus on the west side of the road.

Cable testified, on cross-examination by defendants' counsel, that he had been driving a bus for 10 years; that his run on the night in question was from Chicago to Quincy, a distance of 293 miles; that he left Chicago about 8 p. m.; that the highway at the point where the accident occurred ran north and south and was about 20 feet wide; that the collision occurred about two and a half miles south of the town of Gardner; that from the time he left said town until the accident occurred he drove along the right or west side of the highway; that after he saw the northbound automobile run into the ditch on the east side of the highway and then come up out of the ditch onto the highway and

head toward him, he "threw the bus off of the highway, that is, half of it onto the shoulder . . . the right shoulder on the west side"; that at the time of the collision "the right wheels of the bus was off the pavement entirely . . . three feet"; that the automobile struck the left front fender of the bus; that just before the automobile struck the bus he imagined that it was traveling "around sixty or sixty-five miles an hour"; that at the time of the impact "I was knocked loose from the controls of the bus and the bus weaved from one side to the other for about fifty feet before I regained control of it"; that when the bus stopped "its front end . . . was about three feet off the pavement cross-ways of the highway"; and that after the collision the northbound automobile stopped in the "east ditch . . . about sixty or seventy feet behind the bus"; and that "it was pretty badly damaged . . . all of it."

Cable testified, on cross-examination by the attorney for the codefendant, that he drove through Gardner at around 10:15 p. m. and that the accident happened about 10:20 p. m.; that Gardner was about two and a half miles from the scene of the accident and that the city of Dwight was about eight miles south of the scene of the accident; that "150 feet prior to the time of the accident" the bus was traveling "around forty-five or forty-six, or forty-one miles an hour"; that he imagined "the other car was going sixty or sixty-five miles an hour . . . the way it was traveling"; that when the north bound automobile was about 100 feet to the south of the bus "it seemed to go into the ditch and take a circle and into the ditch and back on the shoulder . . . the ditch wasn't very deep . . . very shallow . . . it made a quite quick turn on the pavement when it came back on the road"; that it was then about 40 feet away from the bus; and that at that time he imagined the bus was traveling about 35 miles an hour.

On redirect examination Cable testified that the bus was equipped with air brakes, which were in good mechanical condition; that traveling at a speed of 35 miles an hour he could have stopped the bus in about 40 feet; that traveling at a speed of 45 miles an hour he could stop the bus in about 70 or 75 feet; that after the accident both vehicles were on the east side of the highway; that he had been "driving at different times before this accident occurred . . . around fifty or fifty-five miles an hour"; that the bus was about eight feet wide; that when he first "noticed the automobile swerve on the road . . . it could possibly have been 200 feet to the south of the bus . . . it is pretty hard to judge the distance at night that way."

Harold Jordon testified on behalf of defendants that he was the steward on the bus involved in the accident; that he "was standing in the front of the coach by the door"; that "the first I saw of this car that was meeting us, the first I noticed it, it swerved off the road, got onto the shoulder, it was I imagine about one hundred, about around one hundred and fifty feet from us . . . that was around a hundred and fifty feet from us this car swerved out on the shoulder, I imagine . . . She cut back then onto the pavement . . . came up on the pavement about fifty feet ahead of us, and at that our driver chauffered his bus out on the shoulder, this lady came across the road and hit the coach head on"; that he was standing "in what is known as the door well" directly at the windshield; that his attention was directed to the northbound automobile when it was one hundred and fifty feet to the south because it swerved off onto the east shoulder and then swerved back onto the roadway proper; that "it came back onto the pavement . . . she crossed the pavement and hit the bus . . . the bus was or the two wheels was out on the west shoulder"; that "the car struck the bus on the left headlight which would be my left"; that immediately after the impact the bus "swerved to the east";

that when it came to a stop it was "setting east and west across the road facing east."

Jordon testified on cross-examination by the attorney for the codefendant, that when the automobile swerved back from the ditch to the right of the highway onto the pavement, it was about 50 feet away from the bus; that at that time the front wheels of the automobile were "across the center line . . . to the west"; that the front left side of the automobile came in contact with the bus; that when the automobile went off the highway into the ditch to the east of said highway about 150 feet away from the bus, the latter was traveling between 45 and 50 miles an hour.

On cross-examination by counsel for plaintiffs Jordon testified that the driver of the bus was not thrown out of his seat but that he "scooted forward in his seat . . . he was scooted out in his seat forward"; that the left front bumper of the bus, which was made of very heavy iron was broken off; that "a headlight was smashed up a little bit but it was still lit" and the left front fender was damaged; that the bus was equipped to carry 30 passengers and that it carried 29 that night; that from the time he first saw the northbound automobile "hit the shoulder of the road until the collision with the bus . . . it apparently was going the same speed"; that "from the time the automobile started into the shoulder of the road until the time of the impact, a distance of around one hundred feet," he thought the driver of the bus tried to "slow it down immediately as soon as the automobile turned onto the shoulder of the road" and at the time of the impact the bus was going "around thirty-five or thirty"; that "the bus was traveling on its own side of the road"; that as he looked out the windshield he saw "a black line through the center of the highway"; that he imagined the bus "was about two feet on the west side of it"; that the bus "swerved out on the west shoulder . . . about half the coach, three wheels . . . the bus

was going south . . . a little southwest''; that at and immediately prior to the time of the collision he was looking straight ahead through the windshield with nothing to obstruct his vision; and that at the time of the impact the right side of the bus was ''still out on the shoulder'' headed ''mostly south . . . it may have been a little west.''

Harry J. Hathaway testified in substance that he was an investigator and adjuster for the Continental Casualty Company of Chicago; that he was ''traveling north on U. S. Highway No. 66 in his automobile'' at about 10:30 p. m.; that he ''was traveling about between forty-five and fifty-five miles an hour . . . and an automobile passed me on the left at a much greater speed than I was traveling then . . . it cut in front of me rather sharply and then it veered back to the center of the street astraddle the center line of the highway, then it veered to the right or the east side of the highway, and in coming back to the center, it made another veer . . . the right side wheels appeared to go off the east shoulder of the highway . . . that was a distance of about four hundred, possibly five hundred feet from my car, ahead of my car . . . and the automobile suddenly veered toward the left or toward the west side of the highway, the south traffic line, and the moment that the car veered from the east edge of the highway toward the west edge, at that moment the bus veered toward the west shoulder, running off on the west shoulder . . . a matter of a minute or a couple of seconds, the bus swerved and came right across the highway . . . between me and the car . . . that was the last I seen of the car until I stopped''; that when he reached the scene of the accident and got out of his car codefendant's automobile ''was turned over on its right side . . . the top was toward the highway fence on the east side of the highway and the four wheels were toward the highway . . . the automobile was about forty or fifty feet

north of the bus''; that he ''saw a young man when he was taken out of the automobile; that he looked at the bus and saw that there was a little scuffing or denting of the left front fender right over the wheel, but very pronounced and very deep on the body of the bus ahead of the left rear wheel; that he saw a mark on the pavement made by the right wheels of the bus that had gone off on the west shoulder, a distance of possibly three or four feet''; and that ''those marks from the tires were indistinct from the shoulder, extended a distance of about forty or fifty feet north of the point where the bus made the abrupt turn directly across the highway and made a turn to the east, and were right in line with the right-hand side wheels of the bus . . . there was a considerable amount of glass strewn about the pavement, all of which was on the west side of the pavement, of the center line.''

On cross-examination, by counsel for the codefendant, Hathaway testified that at the time the automobile passed his car it was traveling at a speed of between 60 and 68 miles an hour; that he was 300 or 400 feet to the south of the accident when it happened; that he had noticed the bus shortly ''before this automobile passed me on the left''; that ''the car cut in front of me rather sharply and veered to the right of the road and then back to the center of the road and traveled some distance, approximately one-third over the center of the road, and then came back to the right side of the road, and off the edge of the shoulder or close to the edge of the shoulder . . . my right shoulder, on the right side of the road, on my right side, and just abruptly went toward the left, the south lane . . . and then the car veered in sort of a tail-spin, which was only visualized by me by the tail light, and at that moment the bus veered to his right, and the bus came directly across in front of me''; and that after the accident ''the front of the bus was down over the slope of the shoulder on the right or east side of the

highway . . . was extended down beyond the right side of the highway about four, five or possibly six feet, but I think it was closer to five feet.''

Alice Hathaway, the wife of Harry Hathaway, testified to substantially the same effect as her husband as to the speed of the codefendant's automobile as it passed and cut in front of them and its course on the highway until it collided with defendants' bus. Two other witnesses, Ruth Judge and Mrs. Edward Rue, who were passengers on the bus, gave testimony which tended to support defendants' theory that the automobile ran into the bus while the latter was traveling south in its proper lane on the highway.

Emma Ronell, the codefendant, testified that prior to the time of the accident she was driving her car north on highway No. 66 with her son in the back seat thereof ''resting and sleeping''; that she did not pass any other northbound car prior to the accident; that she was driving along at a speed of not over 45 miles an hour; that when she was 200 feet from the bus she dimmed her headlights; that when she was 100 feet south of the bus she saw that it was approaching with its left wheels two feet over to the east of the black line marking the center of the highway; that she thereupon kept as far over to the right side of the highway as possible; that at no time did she leave the highway or cross to the west of the center line thereof; that the bus did not change its position on the highway; that the left front portion of the bus struck the left front portion of her automobile with a loud and violent impact; and that she was rendered unconscious.

The first question presented is whether the trial court erred in entering judgment in favor of defendants notwithstanding the verdicts of the jury in favor of plaintiffs. Rule 22 of the Supreme Court provides: ''The power of the Court to enter judgment notwithstanding the verdict may be exercised in all cases

where, under the evidence in the case, it would have been the duty of the Court to direct a verdict without submitting the case to the jury." A motion to direct a verdict for a defendant preserves for review only the question of law whether from the evidence in favor of plaintiff, standing alone and when considered to be true, together with the inferences which may legitimately be drawn therefrom, a jury might reasonably have found for plaintiff. (*Thomason v. Chicago Motor Coach Co.*, 292 Ill. App. 104; *Brophy v. Illinois Steel Co.*, 242 Ill. 55; *City of Chicago v. Jarvis*, 226 Ill. 614.) It is only where there is no evidence to sustain a plaintiff's claim that a judgment may be rendered notwithstanding the verdict. (*McCarthy v. Rorrison*, 283 Ill. App. 129.)

It is not claimed that plaintiffs or either of them were guilty of contributory negligence and the evidence shows that they were not. The error of the trial court in allowing defendants' motion for judgment notwithstanding the verdicts and entering such a judgment becomes readily apparent when the evidence in favor of plaintiffs in this cause, together with the reasonable inferences to be drawn therefrom, is considered in the light most favorable to them. In the evidence heretofore set forth there was testimony that clearly tended to prove that defendants were negligent in the operation of their bus. In considering defendants' motion for judgment notwithstanding the verdicts, the established rule, as already stated, is that the court was bound to take the evidence in favor of plaintiffs as true and under that rule the trial court should have accepted as true the testimony that the collision took place while the bus was traveling in the center of the highway with its left wheels and body partially blocking the right of way of the northbound automobile of the codefendant; that said codefendant was driving her car on the extreme right side of the east lane of the highway; that the left front portion of the bus

struck the left front of the approaching automobile; and that the impact caused the automobile to be thrown to its right and overturned in the ditch on its right side with its wheels facing the highway and caused the bus to cut sharply across the road and come to a stop with its front wheels in the east ditch and its rear wheels on the highway. In view of this evidence as to defendants' negligence, it is difficult to understand on what theory the trial court rendered the judgment in favor of defendants notwithstanding the verdicts of the jury, and since there was no justification for the entry of such a judgment, it will necessarily have to be reversed.

Defendants having filed a written motion for a new trial in the trial court, it now becomes necessary under section 68 (3)c of the Civil Practice Act to determine whether because of errors claimed to have occurred during the trial of this cause they are entitled to a new trial. As grounds for the allowance of a new trial, defendants contend in their brief that (1) "the verdict is against the manifest weight of the evidence"; that (2) "the motion of these defendants to withdraw a juror should have been granted because of the theatrical conduct of Mrs. F. Y. Cooper and also because of the interjection of the question of insurance into the case by counsel for the plaintiffs"; that (3) "the trial court erred in refusing to give one of the instructions tendered by these defendants"; and that (4) "the trial court erred in giving one of the instructions tendered by the defendant Emma Ronell." Defendants' third and fourth contentions may be disregarded since in their written motion for a new trial no complaint was made as to the conduct of the trial court either in giving or refusing to give any of the instructions.

Were the verdicts against the manifest weight of the evidence? There was a sharp conflict in the evidence. Two distinct and well-defined theories of fact were

presented to the jury. The verdicts indicate that the jury accepted as true the theory that defendants' southbound bus was traveling in the center of the highway at a high rate of speed, with its left wheels and part of its body extending over the center line into the east lane of such highway and partially blocking same, and that the left front portion of the bus struck the left front of the northbound automobile while the latter was being driven in its proper lane and as far over to the right side thereof as possible. The jury rejected defendants' theory that, while their bus was being driven south on the highway entirely within the west traffic lane, the codefendant, commencing at a point 40 or 50 feet to the south of where the bus then was, drove her automobile in a northwesterly direction toward the bus and that the driver of the latter, when he saw that a collision was imminent, turned and drove the bus to the right so that its right wheels were three feet off the road onto the west shoulder thereof when the left front of the automobile struck the left front of the bus.

By its verdicts the jury stamped the conduct of defendants' driver in the operation of the bus as negligent and not only was there ample justification in the evidence for such finding by the jury but it was supported by the probabilities and physical facts as well. There was nothing inherently improbable in the testimony of plaintiff Florence Cooper and codefendant Emma Ronell, as to the manner in which the collision occurred. On the other hand it is highly improbable that Emma Ronell, a middle-aged married woman, with her son asleep in the back of her car, would drive her automobile on a 20-foot highway on a dark night, with a bus approaching from the opposite direction, as several of defendants' witnesses testified she did. In so far as the record discloses, this woman was both sane and sober. Yet defendants' witnesses would have the jury believe that she drove her car as a drunken cow-

boy might drive a wild bucking broncho, careening from side to side of the highway and even bucking in and out of the east ditch. They have her passing at 65 miles an hour another northbound automobile traveling at 45 or 50 miles an hour and cutting sharply across the path thereof when only from two to five feet in front of same. The witness Hathaway stated that after the automobile had cut sharply in front of him "then it veered back to the center on the street astraddle the center line of the highway." It was apparently not until the northbound automobile had gone back to the east side of the highway after so being "astraddle the center line of the highway" that the driver of the bus first saw it when it was from 100 to 150 feet away. He said that when "it seemed to go into the ditch and take a circle and into the ditch and back on the shoulder . . . it made quite a quick turn on the pavement when it came back on the road"; that at that time it was about 40 feet away from the bus; and that it headed directly toward the bus and struck same. on the west side of the road. As common carriers defendants knew that they were bound to, do all that human care, vigilance and foresignt could reasonably to, consistent with the mode of conveyance they employed to protect their passengers. The driver in charge of defendants' bus could not negligently calculate on his ability to avoid danger to its passengers, nor so calculate and speculate as to the. safety of the passengers in any respect. (*Rowan v. Bartonville Bus Line,* 242 Ill. App. 451.) If, as the driver of the bus states, in effect, the northbound automobile commenced to veer from one side of the highway to the other, when it was from 100 to 150 feet south of the bus, and continued to so veer until the time of the impact, surely the bus driver, with the lives of 29 passengers in his care and charge, was confronted with a dangerous situation. He said he did nothing until the automobile was about 40 feet away and headed toward the bus. He stated that he

then slowed down to 35 miles an hour and turned the bus to the west so that it was partly on the right shoulder of the road when it was struck. This is all the bus driver claims to have done to avert the collision, and assuming his testimony in this regard to be true what he did came too late. There is evidence in the record that from the time he first saw the approaching automobile commence its zigzag course across the highway and for a considerable time thereafter he could have brought the bus to a stop, and it was his duty to do so if necessary to avert the accident. In discussing the law applicable to a somewhat similar factual situation in *Hicks v. Swift & Co.*, 285 Ill. App. 1, the court said at pp. 4, 5:

"That defendant, at the time of and immediately before the collision, was bound to use the care and caution to avoid collision that an ordinarily prudent person would have then and there exercised, is clear. The rule is well stated in *Kessler v. Washburn*, 157 Ill. App. 532, where the court, on page 537, said: 'No owner or operator of an automobile is necessarily exempt from liability for collision in a public street by simply showing that at the time of the accident he did not run at a rate of speed exceeding the limit allowed by the law or the ordinances. On the contrary, he still remains bound to anticipate that he may meet persons at any point in the public street, and he must keep a proper lookout for them and keep his machine under such control as will enable him to avoid a collision with another person, using proper care and caution; and if necessary he must slow up and even stop. . . . The true test is that he must use all the care and caution which an ordinarily careful and prudent driver would have exercised under the same circumstances.' The rule is similarly stated in 42 Corpus Juris, 928, sec. 638.

"It is obvious that as the coupe skidded across the pavement, two courses were open to the driver of the

truck in order to avert a collision. One was to pursue the course which he adopted of slackening his speed and turning to the left, or to apply his brakes and bring his car to a stop, which he testified he could have done within a distance of 15 feet. . . . It is therefore manifest that if he, upon seeing the danger, had at once used the means at his command to stop his machine, which, as he stated, he could have accomplished in 15 feet or one-half of the distance he then was from the coupe, the truck would have halted before it reached the other car and the collision would not have occurred.

"Whether in so acting he used the care and caution which an ordinarily prudent and careful person would have exercised in the same situation or whether such a person would have stopped the car, as he said he might have done, and that the failure to do so was negligence which proximately caused the accident, were questions of fact. *Petro v. Hines,* 299 Ill. 236.''

It is very significant that after the collision both the automobile and the bus landed on the east side of the highway, the former overturned in the ditch east of the highway and the latter with its front wheels in said ditch and its body across the highway to the west. The jury may well have considered it improbable that the vehicles would have come to rest as they did after the accident if the collision took place on the west lane of the highway. If the automobile had struck the left front end of the heavy bus, loaded as it was with 31 persons and the baggage of the 29 passengers, when the right wheels of said bus were on the west shoulder of the road and the front wheels thereof were headed somewhat to the southwest, it is difficult to understand how the impact could have caused the bus to veer almost completely to the east and to proceed across the highway in such a manner that its front wheels were in the east ditch after it came to a stop. If the driver lost control of the bus as a result of the impact, as he says

he did, when its right wheels were on the west shoulder of the road and its front wheels were facing somewhat to the southwest, it is hard to conceive why the bus traveling at a speed of at least 30 or 35 miles an hour did not continue on in the direction it was headed over said shoulder into the west ditch. It may well have appeared to the jurors as much more probable that, while the automobile was proceeding north near the extreme right side of the highway, it was struck by the bus and turned over into the east ditch and that the bus proceeded in a southeasterly direction, finally landing with its front wheels in the east ditch about 40 or 50 feet south of the automobile. The driver of the bus testified that after the impact the bus traveled about 50 feet before he could regain control of it.

We think the reasoning in *Avey v. Medaris,* 272 Ill. App. 207, is particularly applicable to the situation presented here. There the court said at pp. 209, 210: ''It is not possible to reconcile the testimony of the defendant with that of the plaintiff. It was the function of the jury to pass upon the facts in the case, and unless it can be said that the verdict is against the manifest weight of the evidence, the verdict should stand, providing errors of law have not been committed sufficient to cause reversal. *Shearer v. Aurora, E. & C. R. Co.,* 200 Ill. App. 225. The testimony offered by appellee, when considered alone, fairly authorized the verdict. In such cases, courts will not reverse a judgment, when it is not manifestly against the weight of the evidence. *Blackhurst v. James,* 304 Ill. 586.

''The court of review has no right to substitute its opinion for that of the jury in cases of this nature, so long as the verdict of the jury is supported by sufficient evidence. Where the testimony is hopelessly in conflict, the jury must believe one side of the case and disregard the other, in order to arrive at a verdict. Under such circumstances, the prevailing party is entitled to all the favorable inferences legitimately aris-

ing from the evidence and the verdict should remain undisturbed, unless it clearly appears that it was the result of passion or prejudice, or is contrary to the clear weight of the evidence. *Dick v. Zimmerman,* 105 Ill. App. 615.''

As heretofore shown the jury found the codefendant not guilty. However, even though she was also guilty of negligence that proximately contributed to plaintiffs' injuries, ''It is well settled that, when the negligence of two is, in combination, the proximate cause of the injury, either or both may be held responsible for the consequences resulting from their combined negligence.'' *Chicago & Alton Ry. Co. v. Harrington,* 192 Ill. 9.

Defendants claim that what they see fit to characterize as the ''theatrical conduct'' of plaintiff Mrs. F. Y. Cooper, constituted prejudicial error and that the trial court erred in refusing to allow their motion to withdraw a juror because of said conduct. Mrs. Cooper did not testify and appeared in the court room only once during the course of the trial. She entered with her daughter during her counsel's opening statement to the jury. At that time counsel for defendants stated:

''I want to make a motion at this time, if Your Honor please, to withdraw a juror and continue this case, and the ground for that motion is the fact that while counsel was making his opening, statement, apparently the situation was so timed that the plaintiff, Mrs. F. Y. Cooper . . . came shuffling into the court room. She got into the court room about ten feet without any shuffling at all, and when she got about ten feet inside of the court room she began to shuffle her feet upon the floor and looking over at the jury with a smile.

''And it was noticeable by many people that when she turned around to go out of the court room, as she was walking out of the court room she did not shuffle her feet at all.

"And that the action of the plaintiff was of such a prejudicial nature that these defendants can not get a fair trial at the hands of this jury, and the plaintiff should have been in the court room while the jury was being examined."

Plaintiffs' counsel in disclaiming any intention of making a display that was calculated to prejudice the jury stated:

"In answer to that statement of counsel, I will say to the Court that Mrs. Cooper walked in her natural manner that she walks now.

"She has a paralysis of the right side, she does shuffle and drag that foot and there was nothing about this action that was premeditated in any manner.

"Mrs. Cooper was left in her hotel at the Sherman House because I didn't want her present when the opening statement was made to the jury with any reference to her mentality, and the daughter brought her in . . . when the opening statement was being made without any premeditation of any kind, and the testimony in this case is going to show that her smiling and giggling is one of her ailments at this time.

"And to show my good faith, I would be glad to have Mrs. Cooper come in here now and walk into the Judge's chambers or in the court room outside the presence of the jury, without saying anything to her, and I think the Court will observe the same, that that is her mental reaction and it wouldn't make any difference."

We think the court properly denied the motion to withdraw a juror. Mrs. Cooper was one of the plaintiffs in the case and had a right to be present at all the sessions of her trial. The manner in which she entered the court room and conducted herself therein could in any event only have affected the question of the damages that might be allowed her and the defendants on this appeal have not questioned either the extent of Mrs. Cooper's injuries or the amount of damages

awarded her. That she was neither shamming nor exaggerating her physical injuries is indicated by the testimony of Dr. Sigmund Krumholz, who stated: ''On examination of the facial muscles I found that the lower, the facial muscles of the lower part of the face on the right side were weaker than those on the left side . . . on raising the muscles such as by expression and spreading the lips, the left side rose to a higher level than on the right side''; that ''on examination of the oral cavities the tongue protruded fair, well, not well enough, but on protrusion or opening of the mouth there was a drooling of saliva . . . the soft palate in the mouth rose evenly, but defectively . . . the speech of the patient was indistinct . . . she could be understood only with great difficulty when she spoke''; that ''the patient had a tendency every on and off in answering questions to giggle . . . and her power of mental concentration was very poor''; that ''on examination of the extremities I found that the power in the extremities on the right side was not as strong as that on the left side . . . the right arm was in a semi-flexed position and on request to raise the arms, the left arm went up about the level of the right one . . . on walking there was a dragging, a slight dragging of the right limb, and the right limb wasn't raised the same height as that of the left side''; that ''on passive movement, that is on movement by myself of the right upper extremity, there wasn't a give . . . there was spasticity on the right side which wasn't present on the left side.''

Defendants next contend that the court erred in refusing to grant their motion for the withdrawal of a juror ''because of the injection of the question of insurance into the case by counsel for plaintiffs.'' There is no merit in this contention. A careful examination of the record discloses that, while the matter of insurance did appear in the case, plaintiffs' counsel was not responsible therefor. The first mention of insurance

in the trial was made at the instance of defendants' counsel. Following is a portion of the direct examination of defendants' witness Whitney Ferris: "Q. What is your business. A. Insurance. Q. By whom are you employed? A. I am employed by myself. Q. I see; on June 30, 1935, what was your business? A. I was in the insurance business. Q. Now, just elaborate a little. What do you mean, as investigator? A. Well, I was doing investigating, yes, for Gower, Grey and Gower, a firm of attorneys in Kankakee. Independent work."

The following testimony was given on cross-examination by plaintiffs' counsel: "Q. The night this accident occurred, who were you working for? Did you say. A. Gower, Grey and Gower. Q. Gower, Grey and Gower? A. Yes, sir. Q. And who are they? A. They are a firm of attorneys. Q. Who are they representing in this particular matter? A. You mean the companies they represent? Q. Yes. A. Chicago Lloyds Insurance Company."

On redirect examination by defendants' counsel Ferris testified as follows: "Q. Do you know what has become of the Chicago Lloyds Insurance Company? A. I understand it is in process of liquidation. Q. Do you know when it went into liquidation? Mr. Mitgang: I object to that. Mr. Brown: You brought it out. Mr. Mitgang: Oh, no. The Court: You certainly did bring it out. It was brought out here. Mr. Brown: Q. Do you know when it went into liquidation? A. I don't recall exactly when. It was some time last year, but I can't recall exactly. Mr. Brown: That is all."

Dr. P. J. Reynolds was called as a witness in defendants' behalf. After it had been developed on cross-examination that certain testimony given by Dr. Reynolds was not based upon a record which he had made himself, plaintiffs' counsel moved that such testimony be stricken from the record. Thereafter the trial judge interrogated the witness as follows: "The Court:

Wait. You stated that this document you used to refresh your recollection is a copy? The Witness: A. Yes, a copy of the record shown me that I had sent— The Court: Q. You made the record that this purports to be a copy of? The Witness: A. Yes, sir. The Court: Q. I say you made the record that this purports to be a copy of? The Witness: A. Yes, I made it out. The Court: Q. You made it out. The Witness: A. Yes, sir. The Court: Q. When did you make it. The Witness: A. Sometime after the accident. The Court: Q. When did you make it? The Witness: A. I got a report from an insurance company. The Court: Q. No, no. No, when did you make the record this purports to be a copy of? The Witness: A. (No response.) The Court: Q. That night or a week after, or when? The Witness: A. No, about a month after. The Court: Q. And who made that? The Witness: A. We had a temporary—. The Court: Q. We are not talking about 'we.' We are talking about you. The Witness: A. Mostly from my memory and some notes I had in the office. The Court: Q. Who made the notes? The Witness: A. I made them the night of the accident. The Court: Motion overruled.'' Plaintiffs' counsel then resumed his cross-examination as follows: ''Q. Have you still got those notes in your office that you made? A. No, sir. Q. How long has it been since you saw the original record that you made in this case? A. Probably two weeks ago, and I think the record made for the insurance company— . . . Q. Where did you see that record? A. It was brought up to my office by, I presume, a representative of the insurance company.''

It clearly appears that the matter of insurance was first injected into the case on the direct examination of the witness Ferris by defendants' counsel. It is true that on cross-examination of Ferris plaintiffs' counsel was permitted without objection to elicit from the witness the answer that the firm of lawyers which ·

employed him as an investigator represented "Chicago Lloyds Insurance Company" and then on redirect examination defendants' counsel was permitted to interrogate the witness in such a manner as to apprise the jury that Chicago Lloyds Insurance Company was in liquidation and was also permitted to show, over the objection of plaintiffs' counsel, that said insurance company "went into liquidation . . . sometime last year." The next mention of insurance in the case was when the court asked the witness Dr. P. J. Reynolds, "When did you make it?" and he answered, "I got a report from an insurance company." It is true that, thereafter, Dr. Reynolds again mentioned insurance twice during his cross-examination by plaintiffs' counsel, but in both instances the answers of the witnesses were not responsive to the questions asked. The witness was asked, "How long has it been since you saw the original record that you made in this case?" and he answered, "Probably two weeks ago, and I think the record made for the insurance company—" "Q. You hadn't seen this record you say you made a month after this accident happened, you didn't see that until two weeks ago? A. Yes, sir. Q. Where did you see that record? A. It was brought up to my office by, I presume, a representative of the insurance company."

Where, as here, the question of insurance was brought out in the first instance by defendants' counsel and in the second instance by an unresponsive answer of one of defendants' witnesses to a question asked by the court, the injection of the matter of insurance into the case surely cannot be held to be such prejudicial error as requires a reversal.

As already stated there is no claim that the damages awarded plaintiffs are excessive. They were innocent victims of the collision between the two vehicles. Either the driver of the bus or the driver of the northbound automobile or both were guilty of negligence that resulted in plaintiffs' injuries. The question of negli-

gence was purely one of fact for the jury to determine. The jurors saw and heard the witnesses and had an opportunity to observe their demeanor while testifying. There was sufficient evidence to support the verdicts and no convincing reason has been shown why they should be disturbed. In our opinion the verdicts of the jury were not actuated by passion or prejudice and a fair trial was had which resulted in substantial justice being done between the parties.

For the reasons stated herein the judgment rendered by the superior court in favor of defendants notwithstanding the verdicts of the jury is reversed and judgment is entered here on the verdicts of the jury against defendants and in favor of plaintiffs Mrs. F. Y. Cooper and Florence Cooper for $12,000 and $1,000, respectively.

*Judgment notwithstanding the verdicts reversed.*

*Judgment here on verdicts against defendants and in favor of plaintiffs Mrs. F. Y. Cooper and Florence Cooper for $12,000 and $1,000 respectively.*

FRIEND and SCANLAN, JJ., concur.