Anton Walaite, Appellant, v. Chicago, Rock Island and Pacific Railway Company et al., Appellees.

Gen. No. 41,151.

6

Opinion filed
June 19, 1940.

JULIUS H. SELINGER, of Chicago, for appellant.

MILTON V. THOMPSON and DANIEL TAYLOR, both of
Chicago, for appellees.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered
the opinion of the court.

Plaintiff Anton Walaite, an employee of the de-
fendants, brought this suit under the Federal Em-
ployers' Liability Act seeking to recover for personal
injuries alleged to have been sustained while in the
employ of the defendants. The cause was tried before
a judge and jury. The jury returned a verdict for
$15,000 in favor of plaintiff and the trial court allowed
defendants' motion and entered an order dated Sep-
tember 28, 1939, for judgment for defendants notwith-
standing the verdict for plaintiff, from which plaintiff
brings this appeal.

It appears that on September 30, 1936, the plaintiff, while employed as a car inspector in the LaSalle Street Station at Chicago, was required as part of his duty to inspect certain trains operated out of the LaSalle Street Station in Chicago and to make such reports as might be necessary; that it was the duty of the defendants to furnish plaintiff with a reasonably safe place to perform his work; that on the day plaintiff was injured he was working under one of the cars of the train known as the Golden State Limited; that the train was undergoing its final inspection in said LaSalle Street Station just before its departure for California; that plaintiff, a car inspector, had been ordered to get underneath a car of said train and replace a loose brake key.

It further appears that the train was put into motion while plaintiff was underneath one of the cars and that plaintiff was violently crushed between the roadbed and parts of the car and thereby severely injured.

It further appears that plaintiff had been employed by defendants for more than 30 years; that he was first employed as a car cleaner and then as a car repairer and for the last 19 years as a car inspector; that his work was performed in the LaSalle Street Station at Chicago; that inspections were always made just prior to the departure of trains; that plaintiff's duties required him to go between cars, look under the undercarriage of the cars and examine the journal boxes or hot boxes, and replenish the oil supply.

It further appears that for some 14 years prior to September 30, 1936, plaintiff worked on what is called the second shift; that his tour of duty began at 3:30 p.m., and ended at 11:30 o'clock p.m.; that on September 30, 1936, at about 7:30 p.m., the Golden State Limited, sometimes referred to as train No. 3, consisting of an engine and 12 cars, had been backed into and was standing in the LaSalle Street Station at Chicago, Illinois; that passengers, freight and mail were being loaded upon the train and the train was preparing for de-

parture to the State of California and was scheduled to leave at 8:45 p.m.

It further appears that the plaintiff and one Anton Skoda were making an inspection of that train and, as was customary between them, the plaintiff inspected the west side of the train and Anton Skoda, the east side; that while plaintiff was so engaged in his work, Anton Skoda called plaintiff over to the "Rock Bay," which was the 11th car away from the head of the train and the second last car of the train; that the plaintiff Walaite was told by Skoda that a brake shoe key in the lead wheel of the forward truck of the "Rock Bay" was loose and sticking up out of its shoe.

It further appears that before calling Walaite, Skoda had been working for approximately 10 minutes in an effort to get the brake shoe key back into its place and had been unable to do so; that Skoda ordered plaintiff to get under the car and manipulate the key from underneath while he, Skoda, did so from above; that before going under the car, Walaite asked Skoda if a blue light had been displayed; that Skoda assured plaintiff that it had been displayed and that it was safe for him to go under the train; that the two men worked together on the key for another 10 minutes when Skoda decided that more help would be needed; that Skoda thereupon called another car inspector, one Lawrence Schuit, to help; that the three men worked for some minutes but were unable to wedge the key in; that Anton Skoda thereupon left for about 10 minutes and returned with a thinner and better fitting key from another nearby car and the three men were in the process of fitting in the new key.

It further appears that while the men were working, the conductor Homer Morris, having completed his check up of tickets at the gate, was going to the front of the train and saw Anton Skoda and Lawrence Schuit working on the wheel and knew that the plaintiff was underneath the car; that several other persons, includ-

ing the station master, stood by watching the men work; that Anton Skoda told the conductor to hold the train and not move it out of the station until the repairs had been completed.

It further appears that at precisely 8:45 p.m., without any warning, bell, whistle or other notice to the men working, the Golden State Limited got under way.

It further appears that plaintiff was caught underneath the train and crushed by its sudden motion, hurtled and turned several times beneath it; that plaintiff succeeded in grabbing a hand hold on some part of the undercarriage and was dragged a distance of about 40 to 60 feet and that another member of the repair crew succeeded in halting the train; that the plaintiff crawled out from under the train and was taken by the station master to his office and there some 15 minutes later was examined by a physician who had been called by the station master; that none of plaintiff's bones were found to have been broken but there were some bruises on his shoulder, elbow and leg; that when plaintiff recovered sufficiently from the shock of the experience he went back to work and made one round of inspection; that thereafter, at home that night as well as for the next succeeding several days, he felt stiff and uncomfortable and was massaged with alcohol.

It further appears that from the date of the accident, plaintiff's health began to fail, he lost his appetite, lost weight and could not sleep nights; that his sleep was disturbed by dreams of the accident and he would awake in fright, bathed in perspiration, and tired easily.

It further appears that on January 17, 1937, which was some 15 weeks after the occurrence of the accident, while plaintiff was performing his duties in the LaSalle Street Station, he became nauseated, weak and ill and vomited a large quantity of blood; that he attempted to continue his work but after another vomiting spell was so weak and shaken by it that when observed by fellow

employees he was reported sick to Anton Skoda and left for his home; that the following day plaintiff was examined by a Dr. Kerwin who made a diagnosis of pulmonary tuberculosis and an X-ray of the lungs corroborated the diagnosis.

It further appears that thereafter plaintiff was confined to his bed for a period of approximately four months, with the exception of occasional trips to the dispensaries of the Municipal Tuberculosis Sanitarium where a phrenic operation was performed on him which collapsed his lung; that he received several injections of a gaseous substance into his lungs and in May, 1937, was admitted to the Tuberculosis Sanitarium where he remained a patient from then to and inclusive of the date of the trial, which was about two years after his admission to the hospital and about two and one-half years from the date of the first lung hemorrhage.

A trial was had before a judge and jury in the superior court which consumed about 10 days and a voluminous record of testimony was taken. As heretofore stated the jury returned a verdict in favor of plaintiff in the sum of $15,000 on April 11, 1939. Motions for a new trial and in arrest of judgment notwithstanding the verdict were filed. These motions the trial court took under advisement for a period of five and one-half months and on September 28, 1939, the trial court allowed the motion for judgment notwithstanding the verdict and entered an order that plaintiff take nothing for his suit and that plaintiff be taxed costs therefor. It is from that judgment that plaintiff brings this appeal.

Plaintiff's theory of the case is that the injuries which he sustained were due to the negligence of the defendants in moving the train in question when they knew plaintiff was in a position of danger.

Defendants' theory of the case is that the plaintiff assumed the risk of his employment and in addition thereto that they were not guilty of negligence in mov-

ing said train; that the plaintiff received no injuries and suffered no damage as a result of the accident in question and they further contend in the alternative that, in any event, certain errors were made during the trial of the case which would entitle them to a new trial.

Testimony as to how the train started was given by the engineer and the fireman. Their testimony is not contradicted by any direct evidence. The engineer was a man of 47 years' experience as an engineer. He had taken the Golden State Limited out of the LaSalle Street Station for about 25 years. He testified that on the night of the accident he sat in his cab awaiting the signal to start; that the usual signal sounded in the customary manner and knowing nothing whatever about the plaintiff being under the train he obeyed the signal, as was his duty, and turned on the headlight of the engine, started the bell to ringing, pulled the throttle and started the train.

The testimony further shows that the fireman had been in the employ of the defendants as a fireman for 26 years and had the rating of an engineer. He testified to the sounding of the usual signal to go and to the ringing of the bell and the starting of the engine as described by the engineer. It was undisputed that neither of these men was aware of plaintiff's position under one of the rear cars of the train, some 800 or 900 feet away from them. These men had no knowledge that the moving of the train would endanger anyone.

Counsel for defendants stated on oral argument that the conductor alone had the authority to give the signal to go and that the conductor did not give the signal, for both sides admit that he stood on the platform outside the train and was never in a position to pull the communicating whistle cord, and it is further claimed that the brakeman stood beside him.

The position of the defendants appellees as disclosed by the briefs and argument is that the signal was given to the engineer to go ahead, but that nobody that they

knew of gave the signal, and in the oral argument counsel said that it was done by some outsider whom they did not know. As a matter of observance of usual and ordinary care, it occurs to us that the jury in considering this phase of the situation, may have thought it would have been a proper exercise of that necessary duty for defendants to have had someone stationed there to see that no one pulled the bell cord without authority.

There was conflicting evidence on both sides. The Rules and Regulations of the Operating Department were offered in evidence. Rule 26, provides as follows:

"A blue flag by day and a blue light by night, displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it. When thus protected it must not be coupled to or moved, nor other cars placed on the same track so as to intercept the view of the blue signals. Workmen will display the blue signals and the same workmen are alone authorized to remove them." In connection with this rule Skoda testified that he saw the conductor Homer Morris there and he told him to hold the train as they were not ready to go, but he did not testify that he put the blue lights there although he knew that they would hold the train. It is very apparent that Skoda knew that plaintiff was in a position of danger and that if the train started plaintiff would possibly be killed, yet the blue lights were not displayed. Skoda testified that he was there telling plaintiff what to do.

Without reviewing this lengthy record in great detail, we think there was sufficient evidence introduced on behalf of plaintiff to make an issue of fact for the jury. We think the trial court did right in denying the motions for instructed verdicts, but we think the trial court erroneously granted the motion for a judgment notwithstanding the verdict.

In the case of *Kinsey v. Zimmerman,* 329 Ill. 75, at p. 79, the court said: "It was there held that the trial

court has no power, when a jury is not waived, to determine the weight and preponderance of conflicting evidence introduced to establish or disprove the facts, and the trial judge is never authorized to take a case from the jury or direct a verdict for the plaintiff where to do so would involve the determination of the preponderance of the testimony, but that court is limited strictly to determining whether there is or is not any evidence legally tending to prove the fact alleged; and this is true even though it appears that the greater weight of the evidence may be on one side or the other; and as such power does not exist in the trial court it cannot be conferred upon the Appellate Court. This rule is established in this State.'' See also *Minnis v. Friend,* 360 Ill. 328.

In *McNeill v. Harrison & Sons, Inc.,* 286 Ill. App. 120, the court at p. 128, said:

''If it were permissible for a trial judge on a motion *non obstante veredicto* to weigh the evidence and enter a judgment according to his opinion as to wherein lies the greater weight of the evidence, then the right to a trial by a jury would be done away with and the judgment of the court substituted therefor. It is only where there is no evidence as a matter of law to sustain either a plaintiff's or a defendant's claim that a judgment may be rendered notwithstanding the verdict.''

In *Capelle v. Chicago & N. W. Ry. Co.,* 280 Ill. App. 471, wherein the court said at p. 480:

''We are not of the opinion that the present Practice Act in allowing a trial court to give judgment notwithstanding the verdict, in favor of a defendant, has in any way abrogated or modified the above rules of law. The trial court has no more power to weigh and determine controverted questions of fact under the present Practice Act, than it had prior thereto. In furtherance of the general principle that it is preferable that cases involving questions of fact should be disposed of on their merits by a jury, rather than upon formal motions,

a trial court after denying a motion for an instructed verdict for defendant, at the close of plaintiff's evidence and again at the close of all the evidence, should not render nugatory the verdict of a jury returned on disputed questions of fact, by rendering a judgment *non obstante veredicto* in favor of such defendant; . . . "

Much evidence was introduced by the parties to this suit as a result of the claim made by plaintiff as to the injuries which he received. These witnesses appeared before the jury who heard them testify upon the witness stand and we think the jury was in a much better position to determine wherein lay the preponderance of the evidence than is a reviewing court. The same principle would apply when considering the question of proximate cause, contributory negligence and other defenses which were interposed which, under the law, are properly left to the consideration of a jury.

In this case the defendants have made a motion in the alternative, that a new trial be had.

Complaint is made as to the instructions given to the jury. We cannot find that the defendants in their written motions for a new trial complain of any erroneous instructions, nor have they, so far as we have been able to find, complained that the trial court gave or refused to give any of the instructions. *Cooper v. Safeway Lines, Inc.*, 304 Ill. App. 302. We have examined the instructions given and we think the court was very liberal to both sides in allowing instructions and that no prejudicial error was committed by the court in this regard. This case is based largely on questions of fact. We think the trial was fairly conducted and that the motions for a new trial were properly overruled. On the motion, however, for a judgment *non obstante veredicto,* we think the trial court was in error in allowing said motion. It is not the province of a judge to weigh the evidence on such motion.

Inasmuch as there has been a fair trial in this case and no prejudicial error has entered which would cause

us to reverse the judgment and remand the cause, it is hereby ordered that the verdict of the jury be as returned and judgment is entered here for $15,000 and costs in favor of plaintiff as should have been done when the cause was before the trial court.

*Judgment reversed and judgment here for plaintiff for $15,000 and costs.*

HEBEL and BURKE, JJ., concur.