Wallace J. Goodrich, Administrator of Estate of Frances Goodrich, Deceased, Appellant, v. A. A. Sprague, Appellee.

Gen. No. 41,006.

Heard in the third division of this court for the first district at the December term, 1939. Opinion filed April 10, 1940. Rehearing denied April 24, 1940.

Topliff & Horween, of Chicago, for appellant; Ralph Horween, Samuel Topliff, Harry M. Plotkin and H. C. Merrick, all of Chicago, of counsel.

Gardner, Foote, Morrow & Merrick, of Chicago, for appellee; Walter M. Fowler, of Chicago, of counsel.

Mr. Justice Hebel delivered the opinion of the court.

This action was instituted by the plaintiff as administrator of the estate of Frances Goodrich, deceased, against the defendant A. A. Sprague, as receiver for the Chicago, North Shore & Milwaukee Railroad Company, to recover damages for the wrongful death of his minor daughter, Frances Goodrich. There was a trial before the court and a jury and a verdict of $5,000 for the plaintiff. The trial court granted defendant's motion for judgment notwithstanding the verdict, and the plaintiff appeals from this order and judgment.

The facts as stated by the parties to this appeal are that the decedent was killed by a train operated by the defendant in the village of Glencoe where Woodlawn avenue crosses at grade the tracks of both the North Shore electric railroad and the Chicago and North-

western steam railroad. Both sets of tracks at this point are parallel and run nearly north and south. Woodlawn avenue runs nearly east and west, intersecting the railroad tracks at an angle. The double tracks of the two railroads run parallel to each other from Harbor street, which is about 1228 feet north of Woodlawn avenue, to a point 878 feet south of Woodlawn avenue, where the Northwestern tracks continue south in a straight line, and the North Shore tracks curve to the east.

At the Woodlawn avenue crossing the distance between the two sets of tracks is 53 feet. The tracks of the Northwestern lie to the west and are on a higher elevation than the North Shore tracks. The difference in elevation between the Northwestern and North Shore tracks is 3 feet 6½ inches.

On the north side of Woodlawn avenue are the North Shore passenger station platforms. The local North Shore trains use this station; the express and special trains do not. The station for Northwestern steam trains is at Hubbard Woods, south of Woodlawn avenue. The ·neighborhood east of the tracks is residential, with about four dwellings to the acre, approximately 10 per cent vacant lots and one or two parks. One of these parks extends south from Woodlawn avenue adjacent to the North Shore right of way, and is used as a playground by children. The right of way owned by the North Shore from Woodlawn avenue to the south extends· 52 feet east of the east rail. There are poles, brush, shrubbery and trees on this right of way extending all the way from Woodlawn avenue to Scott avenue. The line of poles is about 7 feet east of the east rail. The line of trees is about 10 or 12 feet further east, ranging from 17 feet to 20 feet east of the North Shore tracks. There is some conflict in the evidence as to how close to the east rail the brush and shrubbery were. According to the plaintiff's exhibit 3 and the testimony of plaintiff's witnesses, there was

a heavy growth of shrubbery extending fully as far west as the line of poles, and also some bushes between the poles and the tracks. There is evidence offered by the defendant that the brush and shrubbery were about 20 feet from the rail. Defendant's exhibits in evidence show less brush and shrubbery than plaintiff's evidence indicates. The pictures in question were taken on July 28, 1937, five days after the event. There is evidence of witnesses who testified that the photographs of the defendant did not correctly portray the crossing as it was on July 23, 1937, because brush and shrubbery had been removed a few days after the event. There are no gates at the crossing. The warning system consists of four signal posts. All four have flashing red lights and two have bells in addition. For convenience, these posts are here designated A, B, C and D. Signal post A is located on the north side of Woodlawn avenue, just east of the North Shore tracks and is equipped with both a bell and flasher. Signal post B is on the south side of Woodlawn avenue, between the tracks of the two railroads, but closer to the North Shore tracks. It has a flasher but no bell. Signal post C is on the north side of Woodlawn avenue, between the two sets of tracks, but closer to the Northwestern tracks, and likewise has a flasher but no bell. Signal post D is located on the south side of Woodlawn avenue, west of the Northwestern tracks, and like post A has both bell and flasher. Thus the two outside posts have both bells and flashers, while the two inside posts have flashers only. The signals operate as follows: When trains are approaching the crossing on both the North Shore and Northwestern tracks all four signals operate. If only a North Shore train is approaching, then only signal posts A, B and D operate; signal post C does not operate. If only a Northwestern train is approaching, then signal A, C and D operate, that is, signal posts A and D, the ones with the bells, operate whenever a train is approaching the

crossing on either railroad; signal post B is actuated only by North Shore trains, and signal post C only by Northwestern trains. The signals are operated automatically by means of electricity. When a train crosses a certain point in the rail, known as a cut-in point, the signals begin to function. The cut-in point for northbound trains on the North Shore tracks is located 1160 feet south of the Woodlawn avenue crossing; this point is south of the curve in the North Shore tracks. The cut-in point for northbound trains on the North Shore tracks is located 1160 feet south of the curve in the North Shore tracks. The cut-in point for northbound trains on the Northwestern tracks is 3072 feet south of the crossing, which is south of the Hubbard Woods station.

Many of the facts concerning the accident are not in dispute, according to the statement of the parties. The time was July 23, 1937, about 6:00 p. m. daylight saving time. It was a clear day; the sun was out but it was beginning to set. Decedent approached the crossing from the east, on the south sidewalk. She was riding a bicycle, going slowly, and gradually slowed down until she came to a stop with one foot on the pedal of her bicycle and the other on the ground. The front wheel of her bicycle was either just touching the rail or just short of it. The bells at the crossing were ringing as she approached the crossing. They had been ringing for at least five minutes prior to the impact, due in part at least to the presence of a Northwestern steam train, headed north standing at the Hubbard Woods station. Just before the train hit decedent she made an unsuccessful attempt to move back, but it was too late.

There is some conflict in the evidence as to how long decedent was at the track before she was hit; whether or not the train whistle was blown; how fast the train was going; and how far the train traveled after the brakes were applied. Witnesses Sullivan and Turner

testified that decedent was in a stationary position from 15 to 30 seconds before she was hit. Edward Curby, also a witness, corroborates this. He further testified that he saw the girl waiting there, and after the train rounded the curve at Scott avenue he arose from his seat, moved to the edge of the platform, and waved his hand up and down four or five times as a signal to the motorman to blow his whistle. The motorman, Schmidt, testified that he did not see decedent until he was about 150 feet from the crossing, at which time she emerged from behind a tree; she kept coming and stopped near the rail and was only there a very few seconds before he hit her.

There is evidence of one of the witnesses that no whistle was blown until just about the amount of impact, and there is also evidence by one of the witnesses that he heard no whistle at all before the crash. The motorman testified that he blew four or five short blasts on the whistle as soon as he saw decedent, at which time he was 150 feet from the crossing. The testimony of other members of the train crew, who were on duty in the coaches, tends to corroborate Schmidt's testimony as to the distance of the train from the crossing when the whistle was blown, but they heard only one blast of the whistle. There is evidence of some of the witnesses who estimated the speed of the train at about 40 or 45 miles an hour. Another witness testified that it was going possibly 45 or 50 miles an hour but he doubted it. There is some disagreement as to how far the train traveled after the accident. The witness Sullivan testified that there were five cars in the train and that it ran 2½ to 3 times its length after the accident. Another witness, Curby, agreed that it was a four or five-car train. He was not positive about five, but he was sure there were four cars in it. The length of a car is about 60 feet. The members of the train crew testified that the train consisted of three cars and that it traveled about 500 feet from

the point where the brakes were applied to the point where the train came to a stop.

Mrs. Goodrich, the decedent's mother, and a school teacher both testified as to the age, experience, intelligence and capacity of the decedent, and it appears that at the time of her death she was 11 years and 3 months old, and was about four feet eleven inches tall; her hearing and sight were normal; she was a good student, alert and interested in everything, and was a little above the average in intelligence and capacity; she took part in plays, singing, swimming, art and dancing. Decedent had been riding a bicycle ever since she was seven years of age, but it had been only a few months since she had gone any distance from her home. The Goodrich home was in Winnetka, about one block west of the tracks. Decedent had friends who lived east of the tracks some blocks to the south of Woodlawn avenue, and visited them occasionally, but most of the time she was taken there by her mother or by the mothers of her friends. It had been only a year since she had been allowed to cross the tracks by herself. Mrs. Goodrich testified that to her knowledge the only crossing her daughter had crossed on a bicycle was El Dorado avenue in Winnetka, which crosses the tracks of both railroads, and that the El Dorado avenue crossing is protected by gates.

The plaintiff contends that the rule applicable to the instant case is that on defendant's motion for judgment notwithstanding the verdict, the court may not weigh the evidence but must take as true all the evidence favorable to the plaintiff, together with all legitimate inferences which can be drawn therefrom. This is the rule followed by the courts, and it will be necessary to consider the facts in this case to determine whether the court was in error when judgment for the defendant was entered.

The complaint predicates plaintiff's right to recover upon the negligence of the defendant, or of his em-

ployees, in the following respects: (1) failure to see decedent standing at the crossing, or neglect to warn her of her danger if they did see her; (2) violation of the statute which required defendant to remove all brush, shrubbery and trees from the right of way for a distance of 500 feet from the crossing; (3) failure to blow a whistle; and (4) operation of the train at a rate of speed which was excessive in view of all the surrounding circumstances.

There is evidence in the record from which the jury could find that decedent and her bicycle were in a stationary position, near the east rail, for a period of 15 to 30 seconds before she was struck by the train, and one of the witnesses who testified stated that between the time he saw the train coming around the curve at Scott avenue and the moment of the impact, he got up, walked to the edge of the platform and moved his hand up and down four or five times as a signal to the motorman to blow his whistle.

The first inference to be drawn from the evidence in this record is that since the decedent was in a stationary position at the track for 15 to 30 seconds before she was struck, Schmidt, the motorman, saw her as soon as his train rounded the curve at Scott avenue. The danger of her position was apparent, and, from the evidence of the witness, it appears that the front wheel of her bicycle was either just touching the rail or a few inches from it, and the motorman had notice of her presence, according to the witness who saw the girl, and signaled to the motorman to blow his whistle, but no whistle was blown in time to warn the decedent of her danger. One of the witnesses testified he heard no whistle until just about the moment of the impact. Another witness testified that he heard no whistle at all before the crash, and no doubt that evidence was considered by the jury in reaching its conclusion when the verdict was returned finding the defendant guilty and assessing damages. Then, again, if the motorman

did not see Frances Goodrich until he was almost upon her, there is evidence that it was because his view of the crossing was obstructed by the trees, brush and shrubbery growing on the right of way. From the evidence it appears that the brush, shrubbery and trees extended as far as the poles, with some bushes between the poles and the tracks. From the evidence, the motorman admitted that he could not see Frances Goodrich until he was about 150 feet from the crossing because there was a tree there which cut off his vision, and the jury, of course, had the right to consider this evidence on the question of the guilt of the defendant as charged in the declaration.

It is also suggested by the plaintiff that the jury could draw the inference that the motorman did not see decedent at the crossing nor the witness signaling to him from the station platform, because he was not looking ahead. In view of the neighborhood, the existence of a park adjacent to the right of way in which children played, the absence of gates, and the obstructions to view from the brush, shrubbery and trees, the obligation of due care required the motorman to be on the lookout at this crossing. The failure to lookout, as is suggested by the evidence, was sufficient evidence of negligence.

The statute which provides for the removal of brush, shrubbery and trees from the right of way is as follows:

"Every railroad operating within the State of Illinois shall remove from its right of way at all grade crossings within the State, all brush, shrubbery and trees for a distance of not less than five hundred feet in either direction from each grade crossing." (Ill. Rev. Stat. 1939, ch. 111⅔, par. 62, sec. 58 [Jones Ill. Stats. Ann. 112.083].)

While the defendant in effect admitted at the trial that this statute was violated, he contended that

the violation was not the proximate cause of the accident. The statute directed that the removal of the brush, shrubbery and trees was to give the motorman an unobstructed view of the crossing, and this would give the motorman an opportunity to discover the presence of people approaching or crossing the tracks, and also would afford to people approaching the crossing an unobstructed view of the tracks and crossing. This brush, shrubbery and trees grew on the defendant's right of way all the way from Woodlawn avenue south to Scott avenue. From the evidence of a Mr. Young, the village manager of Glencoe, who was a witness, a line of poles stretched along the right of way at about 7 feet from the east rail of the North Shore tracks, and the line of trees was 10 or 12 feet farther east than the poles. The trees were rather large poplars or cottonwoods with low hanging branches, and the underbrush extended fully as far west as the line of trees, if not a little farther. There is also evidence that the shrubbery extended to the telephone poles, and that there were some bushes between the poles and the tracks. That is apparent from plaintiff's exhibit 3, which is a picture of the surrounding property and the tracks of the defendant company.

It is also suggested by the plaintiff that the proximate causation based upon the violation of the statute can also be predicated upon another factor. Because of the arrangement of the tracks at the crossing and the manner in which the bells and lights operate, it was natural for the decedent to approach the track to see if a train was coming on the North Shore track. There is a distance of 53 feet between the two railroads at the crossing, which is more than ample space in which to stand in safety. The local passenger station for southbound North Shore trains is located in that space. Because of this space in which a person can

wait in safety between the two railroads, there is an inducement for a pedestrian or cyclist to regard each set of tracks as a separate crossing, and to pass over each one in turn, after ascertaining that there is no danger on each one separately.

It appears from the evidence that there is a warning signal constructed at this intersection. The two signal posts with the bells (one outside each set of tracks) operate whenever a train is approaching on either railroad. Of the two signals between the two railroads, the one on the north side of Woodlawn avenue, signal C, flashes only when a Northwestern train is approaching, while the one on the south side of Woodlawn avenue, signal B, flashes only when a train is approaching on the North Shore. Neither of these two signals has a bell. The bells on the outside posts sometimes ring for long periods of time, even though no train is actually approaching the crossing on either railroad, and it appears the reason for this is that the northbound cut-in for Northwestern trains is located south of the Hubbard Wood station and during all the time that a Northwestern train, headed north, is standing at that station the bells at the Woodlawn avenue crossing ring. If one waits, therefore, until the bells stop ringing entirely before crossing either track, he may be marooned there for a long time, though no train is actually coming. Hence, the natural thing to do is to look to see if a train is coming, and then cross each railroad in turn with safety. From the evidence it appears that on the day of the accident the bells had been ringing for at least five minutes before decedent came to a stop at the crossing, due in part to a Northwestern train standing at Hubbard Woods, headed north. As decedent approached the crossing on the south sidewalk, the signal post in her direct line of vision was post B, and the flasher on it was not operating. This post had no bells. It did not start to flash

until some time after she came to a stop, for decedent was at the crossing for 15 to 30 seconds before the accident, and the train would cross the cut-in point, 1160 feet to the south, and reach the crossing in less than 20 seconds. There at the Hubbard Woods station was the Northwestern train which no doubt suggested itself to decedent as the reason for the ringing bells, and when the signal on post B finally did begin to flash, no doubt it escaped decedent's attention, for the change it created in the environment was slight and hardly noticeable in view of the Northwestern train and the continuous ringing of the bells. It is contended by the plaintiff that because of the violation of the statute in regard to the brush, shrubbery and trees that obstructed her view, it was impossible for the decedent to see down the North Shore tracks to the south without placing herself in a position of danger, and it does not appear that there is any evidence of an indicated point of danger with reference to the position that may be taken in safety by a pedestrian in regard to the distance between the east rail and the safety point on this sidewalk.

The jury had the evidence before it, and no doubt they considered the conditions immediately surrounding the place of the accident and whether the brush, shrubbery and trees interfered with a clear view of the tracks from a point of safety by the decedent.

The plaintiff cites two cases in which the facts are somewhat similar to those in the instant case: *Lerette v. Director General of Railroads,* 306 Ill. 348; *Chicago & E. I. R. Co. v. Keegan,* 112 Ill. App. 338. In the *Lerette* case the court held the mere fact that the plaintiff was violating the law at the time he was injured will not bar his right to recover, unless an unlawful act in some way proximately contributed to the accident, and although the plaintiff's act in climbing through a string of cars at a railroad crossing may

have been in violation of a statute or ordinance, it remains a question of fact whether the illegal act was the proximate cause of the injury, and as to whether the negligence of the plaintiff was the proximate cause of the injury is a question of fact for the jury. This in a measure applies to the instant case where it is contended that decedent was guilty of contributory negligence at the time of the accident.

Then again in the *Keegan* case, the plaintiff attempted to cross over tracks when the gates protecting the crossing were down. He proceeded across the tracks at a crossing, looking straight ahead, and did not notice a flagman who was waving a lighted lantern. The court, nevertheless, allowed plaintiff to recover since the evidence further showed that the gates at this crossing were frequently kept lowered for long periods of time, even though no train was approaching.

So under the facts and circumstances as they appear in this record it is a question for a jury to determine whether the defendant was guilty of the charges made and the evidence in effect supports the verdict of the jury. When we come to consider the evidence and take as true that favorable to the plaintiff together with all legitimate inferences that can be drawn therefrom, the jury was justified in returning a verdict finding the defendant guilty.

There is evidence in the record that the speed of the train at the time of the accident was 40 to 45 miles an hour, and the evidence as to how far the train traveled after the brakes were applied after the signal was given was a proper subject for the jury, and whether under the circumstances of the giving of a signal and the speed at which the train was traveling there was negligence.

The question of contributory negligence of the decedent who was 11 years of age at the time of the accident, is also a question for the jury. The rule that applies is expressed in the case of *Maskaliunas v. Chi-*

*cago & W. I. R. R. Co.,* 318 Ill. 142, where the court said:

"The law is clearly established by great weight of authority, that between the ages of seven and fourteen the question of culpability of the child is an open question of fact and must be left to the jury to determine, taking into consideration the age, capacity, intelligence and experience of the child." And of course this rule would have to apply to the facts in the case, when we come to consider them, and we are of the opinion that it was for the jury, under the circumstances, to decide whether the decedent was guilty of contributory negligence, and from all the facts and circumstances as they appear in evidence as we have related them here, we are of the opinion that the question of contributory negligence of the decedent was properly for the jury in determining whether the decedent contributed by her acts at the time of the accident to the bringing about of death.

The defendant contends that the court erred in giving erroneous instructions at the request of the plaintiff, one of which is as follows:

"If you believe from a preponderance of the evidence that on or about July 23, 1937 Frances Goodrich was struck and killed by a train of the defendant; and if you believe that the death of said Frances Goodrich was proximately caused by the negligence of the defendant as charged in the complaint, then if you also find that Frances Goodrich was both before and at the time of the accident in the exercise of ordinary care for her own safety, you should find the defendant guilty " And it is contended by the defendant that this instruction does not define the issues between the parties by reference to negligence "as charged in the complaint," and the case of *Lerette v. Director General of Railroads,* 306 Ill. 348, is cited, where the Supreme Court said: '

"The court should not permit the pleadings in civil actions to be taken by the jury when they retire to consider their verdict and we must assume that the court did its duty in this regard and did not deliver the declaration to the jury." Also the case of *Carnahan v. Public Service Co.,* 276 Ill. App. 277, and the defendant further contends that there was no instruction given which told the jury what specific charges of negligence were made in the complaint.

The answer of the plaintiff to this suggestion of error is that some of the authorities cited by the defendant do not sustain defendant's position, and direct our attention to the opening statements of both counsel who told the jury what was charged in the complaint and what the issues were. Plaintiff's counsel stated:

"We claim in this case, and we expect to prove to you, that the accident was caused in a large part, if not entirely, by the fact that there was a dense thick growth of bushes and shrubbery and undergrowth right on the southeast corner, which obstructed the view of anybody here (indicating) looking south, and which we claim obstructed the view of the motorman looking north." And the defendant's counsel stated:

"The charge of negligence in this declaration is—or complaint, rather, that we ran and operated this train at a high, negligent, dangerous rate of speed. That is one charge. The second charge is that we didn't blow a whistle when approaching the crossing." and further that the case was submitted to the jury on instructions which strictly defined the issues as follows: Plaintiff's instruction on the question of brush and shrubbery, followed by the defendant's instruction in regard to the operation of the train and maintenance of the right of way; also the speed of the train, and the further instruction as to what warning was given and whether the motorman saw or should have seen decedent.

It would appear from these suggestions that the jury was fully informed of the acts of negligence charged

against the defendant in the complaint, and that the case was tried upon the issues presented to the jury, and there is the decision of the Supreme Court in the case of *Dickson v. Swift Co.*, 238 Ill. 62, where the court, in part, said:

"It has never been considered reversible error to refer the jury to the declaration unless they are required to determine a question of law as to what are the material allegations. (*Fraternal Army v. Evans*, 215 Ill. 629)" and in *Belskis v. Dering Coal Co.*, 246 Ill. 62:

"Plaintiff in error complains of an instruction given by the court to the effect that defendant in error could recover if the case was proved as alleged in the declaration. While the practice of giving such an instruction is not to be commended, it is not reversable error where every count in the declaration contains the necessary allegations for recovery." So, when we consider the instructions as given, we are not inclined, in view of what we have stated, to consider them as reversable error, and we will not reverse this judgment because of the giving of the instructions, but we are inclined to further consider this instruction complained of by the defendant, where the court said:

"The court instructs you that while the plaintiff must prove his case as charged in the complaint by a preponderance of the evidence, still the proof need not be the direct evidence of persons who saw the occurrence sought to be proved; but facts may also be proved by circumstantial evidence, that is, by proof of circumstances, if any, such as give rise to a reasonable inference in the minds of the jury of the truth of the facts alleged and sought to be proved, provided such circumstances, together with all the evidence in the case, constitute a preponderance of the evidence."

The plaintiff points to a number of facts that appear in the record regarding this question, and contends that the instruction was proper, in view of the facts and considering the distance the train ran before com-

ing to a stop and the evidence as to the length of time it would take for a train going 40 miles an hour to stop, and no doubt the jury considered the distance the decedent was thrown by reason of the impact in view of the testimony of the defendant's witnesses as to whether the brakes were applied 150 feet south of the crossing, and contends that facts like these justified the giving of this instruction.

Other questions are raised regarding the giving of the instructions and we have considered them carefully and are of the opinion that the giving of the instructions was not erroneous, and that the judgment entered by the court was justified.

There is also complaint that the court admitted improper and prejudicial evidence in admitting plaintiff's exhibit 3, which was a photograph showing the crossing where the accident happened. It was taken on the evening after the accident by a reporter of the Chicago Tribune, and there is complaint regarding the location of the camera north of the crossing and pointing in a southeasterly direction. The camera was across the tracks, opposite from where the accident happened, and as stated by the defendant, the plaintiff asked the court to admit the picture for the purpose of showing the condition of the crossing and the shrubbery and trees at the southeast corner, and it was admitted in evidence after the court stated the purpose of the photograph. We are not impressed with the theory upon which it is contended that it was error to admit this photograph in evidence.

We might further add that this photograph, plaintiff's exhibit 3, was admittedly the only photograph showing the condition of the brush and shrubbery which was taken at the same time as the occurrence, and this is sustained by the evidence of witnesses who testified that the photograph correctly showed the physical condition and appearance of the shrubbery at

the time of the occurrence, and then it is to be noted that the defendant's pictures, admittedly taken five days later, from the evidence of three disinterested witnesses, did not correctly show the condition of the brush and shrubbery at the time of the occurrence, because it had been cut down in the intervening period, and it does not seem that the defendant is in a position to complain because the pictures he offered and were admitted in evidence showed there had been a change of condition from that of the day of the occurrence.

In view of the conclusion we have reached, the judgment of the court will be reversed and judgment entered in this court upon the verdict of the jury in the sum of $5,000.

Upon a like question this court in the case of *Russell v. Richardson,* 302 Ill. App. 589, entered judgment for the plaintiff, notwithstanding the verdict of the jury was reversed in the trial court. See also *Martin v. Sixty-Third & Halsted State Sav. Bank,* 299 Ill. App. 123.

*Judgment reversed and judgment here.*

Denis E. Sullivan, P. J., and Burke, J., concur.