**August Dahlberg, Appellant, v. Chicago City Bank and Trust Company, Appellee.**

**Gen. No. 41,571.**

232

Opinion filed April 28, 1941.

P. F. MURRAY, of Chicago, for appellant; EDWARD T. HAVEY, of Chicago, of counsel.

RATHJE, HINCKLEY, BARNARD & KULP, of Chicago, for appellee; FRANCIS E. HINCKLEY, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff brought an action against defendant to recover $2337.50, being the damages claimed to have been sustained by him on account of defendant selling plaintiff a note secured by a mortgage on real estate in Chicago, the signatures of the note and coupons being forgeries. At the conclusion of the evidence defendant moved for a directed verdict, the court reserved its ruling, the case was then submitted to the jury and a verdict rendered in plaintiff's favor for the amount of his claim. The verdict was returned January 5, 1940, in open court and at that time counsel for defendant filed two motions, (1) for judg-

ment in defendant's favor notwithstanding the verdict, and (2) an alternative motion for a new trial. June 14, 1940, the court sustained defendant's motion for judgment notwithstanding the verdict, and plaintiff appeals. The court did not pass on the alternative motion for a new trial and apparently it was not brought to his attention.

The record discloses plaintiff was about 81 years old, had emigrated to this country in 1882, and had been doing business with defendant bank for about ten years prior to January, 1937. He had a savings account and a checking account with the bank and also a safety deposit box.

January 27, 1937, plaintiff and his son, who at the time of the trial was residing in Montana, went to the bank and purchased a promissory note for $3,000 dated November 2, 1934, due five years after date with interest at the rate of 6% per annum, payable semi-annually on the 2nd day of May and November each year. The note was secured by a trust deed. The business was conducted by plaintiff and his son on the one side, and Harold Thompson, an employee of the bank for fourteen years, on the other. More than a year thereafter, it was discovered that the signatures of the note and coupons were forgeries and plaintiff's position is that defendant bank is liable for the loss he sustained through the dishonesty of its employee, Harold Thompson, who was acting within the apparent scope of his authority. On the other side defendant contends plaintiff dealt with Thompson in his individual capacity; that the bank had nothing to do with the transaction and that this is shown by all the evidence when viewed in the light most favorable to plaintiff and therefore the judgment *n. o. v.* was proper and should be affirmed. On this point counsel say "defendant's theory is that there are no controverted questions of fact and no material conflict in the evi-

dence. The plaintiff's evidence disclosed that the transaction of which he complained was the purchase of a forged note from a person other than the defendant, the payment by the plaintiff for the same to a person other than the defendant, the issuance of a bill of sale to the plaintiff by this other party, who was neither an employee of, nor known to, the defendant, and that plaintiff was fully aware of the fact that he was not dealing with the defendant.''

Plaintiff testified he lived with his daughter, Mrs. Sundberg, in Chicago; that he had a savings account with defendant bank since 1931, a checking account since 1937, and a safety deposit box for three or four years; that June 19, 1936, he bought a mortgage from the bank through its vice president Robert Anderson, for which he paid $2,987. At that time he got the mortgage papers and put them in his safety deposit box in the bank; that he bought the mortgage on the second floor of the bank in the real estate department. These papers were produced on the trial; the note was payable at the bank in monthly installments of $40, and the payments there made; that shortly after he purchased that mortgage he met Harold Thompson on the second floor of the bank in the real estate department in connection with the renewal of fire insurance on the property securing the mortgage; that Thompson attended to the insurance and some time thereafter, called to see plaintiff at his home; that Thompson there said: ''he got some foreclosure property that he thought could be bought pretty cheap. He showed me the places, but I didn't want them. Then he came another time,'' and showed him another piece of property. ''He said the bank had three mortgages for sale. He took me along to the places in an automobile. I looked at the places. I didn't do anything that day. I told him to take my son along and we should look at them. We went along and my son looked at them. . . . I next saw Mr. Thompson

on the second floor in the real estate department of the bank. He had a desk there. There was a railing on the outside and a desk inside. He was sitting at that desk. I told him I would buy a mortgage on Ada Street property. My son was with me. We closed the deal that day. My son lives in Montana.'' That Thompson said he wanted $3,000 for the mortgage and $37 for the insurance. Thompson then made out a slip so plaintiff could go downstairs and obtain a cashier's check. The slip showed the check should be payable to Gustaf Orenberg; that he took the slip downstairs and obtained the cashier's check; that he never saw or heard of Mr. Orenberg before or since; that he took the check upstairs and gave it to Thompson and Thompson gave him the mortgage papers. [The trust deed, principal note and all of the coupons then unpaid, guarantee policy of the Chicago Title & Trust Company and the fire insurance policy.] ''I asked for a bill of sale and this is what he gave me.'' That afterward about March 1, 1937, he left coupon No. 5 which became due May 2, 1937, for collection at the bank on the second floor. This was before he went to Montana, which was about March 20, and he did not return until Armistice Day, November 11. Before leaving he gave instructions to his daughter as to presenting the interest coupons while he was away and when he got back he received the money from his daughter for coupons No. 5 and No. 6; that about the middle of April, 1938, he took coupon No. 7, which was due May 2, 1938, and left it with the bank for collection in the real estate department on the second floor. When plaintiff went to the bank in 1938, one of its representatives told him to go down to the deposit box and get the mortgage papers so they could be examined, which he did. The representative told him the note and coupons were forged—the trust deed, the title guarantee and policy genuine. At that time the vice president told plaintiff he had fired Thompson

February 1, 1937, and that he should have fired him long before.

The witness further testified that shortly thereafter he went with a representative of the bank to the Criminal Court Building on two occasions and the representative wanted him to swear to a complaint against Thompson but plaintiff refused to do so until he consulted his attorney; that he did so and was advised not to sign the complaint; that the bank official refused to do so. Apparently Thompson was not apprehended. At the time the papers were said to be forgeries. At defendant's request, plaintiff left his papers with the bank for examination so they might be photographed, which was done and they were returned to him a few days thereafter.

On cross-examination plaintiff testified he purchased the mortgage in 1936, from a person who sat at the same desk where Thompson sat afterward—"in the real estate department. He was at the same desk where I got this other one. I don't know the man's name. I met Thompson about a month after that," in the real estate department. That about March 4, after he bought the mortgage in question Thompson came to his house and gave him $40; that "I said I didn't want his money. I got enough interest already." But Thompson left the money; that when he got the mortgage papers from Thompson he put them in the safety deposit box; that after the parties went to the State's Attorney's office, as above stated, the attorney who was then representing plaintiff, collected $700 from Thompson and credit was given for this amount in plaintiff's complaint.

Henning A. Dahlberg, plaintiff's son, testified that January 27, 1937, he went with his father to the real estate department on the second floor of the bank and the father spoke to Thompson. This witness's testimony as to what took place is substantially the same as that given by his father.

Mrs. Sundberg, plaintiff's daughter, testified that after her father went to Montana (shortly after he purchased the mortgage in question) Thompson came to their house and said he had the interest, $90, coming due on the mortgage; that she told him the coupon was down in the safety deposit box; that he gave her the money and told her to go get the coupon and give it to him, which shortly thereafter she did; that afterward her father told her she had given Thompson the wrong coupon; that she then called Thompson on the telephone and told him of this mistake and he said: "I noticed that." That the next morning Thompson drove by their home and took her down to the bank, waited outside in the car for her; that she went upstairs in the bank to the little cage. "I had a receipt from the bank and I gave the girl the receipt when she gave me the coupon." That she then went down to the deposit box, put in the coupon Thompson returned to her and gave him the proper one. That when the next coupon came due six months later, Thompson again called her up and told her he had the money; that she went to the deposit box, got the coupon, gave it to Thompson and he paid her the money at their home one evening. Coupon No. 7 was deposited afterward for collection with the bank, as above stated.

There is evidence on behalf of defendant to the effect that the mortgage in question, when it was originally made in November, 1934, was sold to Mr. Holtorff who was a brother-in-law of the vice president of the bank and who prior to 1930 had been cashier of the bank for about thirty years.

Mr. Rathje, vice president of the bank, testified he had charge of the real estate loan department of the bank for about fifteen years and had charge of the employees of that department; that when the mortgage was sold to Mr. Holtorff in 1934, the bank retained the trust deed and guaranty policy giving the

principal note and coupons to the purchaser. That Harold Thompson was employed by the bank; that he was a solicitor of insurance—sometimes acted as chauffeur and sometimes as messenger to take papers to the recorder's office, etc.; that he never sold any mortgages for the bank or negotiated with customers of the bank for such sales; that when insurance was expiring where the bank had made loans, Thompson secured renewals of the policies as provided by the trust deeds; that in doing so he had "access to the files and records of the bank as to the trust deed and other papers there in the loan, because the insurance policies, trust deed, and guaranty policies were all filed in one file under that particular loan number." That Thompson was discharged about February 15, 1937; that the bank did not learn of his dishonesty in connection with the mortgage in the instant case until the spring of 1938, when the interest coupon No. 7 was left at the bank for collection by plaintiff.

On cross-examination he testified that Thompson had access to the files which were kept in the vault and that he had been employed by the bank from 1923, until February, 1937.

There is considerable other evidence in the record but we think it would serve no useful purpose to detail it further for we are of opinion that whether Thompson, in the transaction involved in the instant case, was acting for himself or purported to have been acting for the bank was clearly a question for the jury. Plaintiff had been a customer of the bank for some time. About six months prior to the time in question he purchased the mortgage from the bank, transacting the business on the second floor; shortly afterward he met Thompson at the bank in the real estate loan department in connection with the insurance on the property covered by that mortgage. Thompson then saw him two or three times at his home trying to interest him in some foreclosures. Shortly thereafter

Dahlberg purchased the mortgage in question for face value, doing business with Thompson who sat at the same desk as did the person from whom he bought the first mortgage. We think the jury was warranted in finding plaintiff thought he was dealing with the bank and that the bank permitted Thompson to act as though he had authority in the matter. Thompson had access to the files. In these circumstances we think the court erred in entering judgment *n. o. v. Pfeiffer v. Farmers' State. Bank,* 263 Ill. App. 360.

But defendant contends there was a variance between the allegations of the complaint and the evidence, and therefore his motion for a directed verdict should have been sustained. We have examined the record and are unable to find that the question of variance was in any way brought to the attention of the trial court. But in any event we think there is no merit in the contention. Plaintiff charged defendant with negligence in the manner in which it permitted Thompson to transact the business and ought not now be permitted to say there was no negligence on its part.

Since the filing of the briefs, the Supreme Court of this State has handed down two opinions in *Walaite v. Chicago, R. I. & P. Ry. Co.,* 376 Ill. 59, and *Goodrich v. Sprague,* 376 Ill. 80, on the question of procedure to be followed under § 68 of the Civil Practice Act. In each of these cases there was a verdict in plaintiff's favor after which defendant filed two motions—a motion for a judgment for defendants *non obstante veredicto* and for a new trial. The motion for judgment *n. o. v.* was allowed and judgment entered for defendants, the motions for a new trial were not passed upon but were passed upon by this court in *Walaite v. Chicago, R. I. & P. Ry. Co.,* 306 Ill. App. 5; *Goodrich v. Sprague,* 304 Ill. App. 556, which was held by the Supreme Court to be error, holding that the jurisdiction of this court to review judgments of the trial court

is appellate only; that the motion for a new trial was addressed to the trial court and the judgments of this court in the two cases were reversed and the cause remanded with directions to the trial court to pass upon the motions for new trials.

In the *Goodrich* case, our Supreme Court referred to the case of *Montgomery Ward & Co. v. Duncan,* 311 U. S. 243, where a somewhat similar question was under, consideration and said that the Supreme Court of the United States suggested that to prevent delay and unnecessary retrials the trial court should have passed on *both* motions. While in the two cases decided by our Supreme Court the Appellate Court passed on the motions for new trials (which is not the fact in the case at bar), yet we are of the opinion the trial judge should pass on the motion for a new trial. Following the suggestion of the United States Supreme Court in the *Duncan* case, we think both motions should have been passed upon by the trial court.

For the reasons stated, the judgment of the Superior Court of Cook county is reversed and the cause remanded with directions to set aside the judgment entered in favor of defendant notwithstanding the verdict and to pass upon defendant's motion for a new trial.

*Reversed and remanded with directions.*

MATCHETT and McSURELY, JJ., concur.