Mary Osborn et al., Appellants, v. William Leuffgen et al., Appellees.

Gen. No. 41,794.

Heard in the first division of this court for the first district at the June term, 1941. Opinion filed December 22, 1941. Rehearing denied January 5, 1942.

RATHJE, HINCKLEY, BARNARD & KULP, of Chicago, for appellants; FRANCIS E. HINCKLEY and JAMES P. WALSH, both of Chicago, of counsel.

LORD, BISSELL & KADYK, of Chicago, for appellees; RAYMOND WEARING and GORDON R. CLOSE, both of Chicago, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiffs base their right to recover damages on the provisions of § 14 of the Dram Shop Act (ch. 43, par. 135, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 68.042]) making the tavern keeper, his bartender and

the owner of the premises in which the tavern was conducted defendants. At the clase of plaintiffs' case, defendants moved for a directed verdict. The court reserved ruling on the motion. Thereupon defendants rested their case and again moved the court to instruct the jury to find defendants not guilty, which motions the court reserved. The case was then submitted to the jury whose verdict was in plaintiffs' favor for $4,800–$3,600 was awarded to Mary Osborn, the widow of Hope J. Osborn who died within 48 hours as a result of injuries he had received in the tavern and $300 was awarded to each of the four minor children. Afterward defendants filed "their written motions in the alternative for judgment notwithstanding the verdict, for a new trial and in arrest of judgment." The court sustained defendants' motion for judgment notwithstanding the verdict but did not pass on the other motions and plaintiffs appeal.

The record discloses that Hope J. Osborn, 46 years of age, was employed by the Illinois Central Railroad Company as a switchman, near Van Buren street, Chicago. He lived with his family, his wife and four minor children, who are plaintiffs here, at 9309 Cottage Grove avenue, Chicago, in an apartment on the second floor. Defendant, William Leuffgen, owned and operated a tavern located on the first floor of the building where the Osborns lived. October 19, 1938, Osborn went to work as usual and finished his day about midnight. He then took one of the Illinois Central trains and when he got to the station, which was about three blocks from his home, it was about 12:47 o'clock. He then went to the tavern where defendant, Peter Gilgenberg, was tending bar and there met Joseph Dobry and Axel Berkquist, patrons of the tavern, all of them being acquainted. They had some beer and sat around and played a game with dice. While they were in the tavern, Helen Hrabar and her escort, William Lefkie, came into the tavern and went

to the back room where they were served by the bartender. Some time thereafter there was loud talking and an argument between Osborn and the other two customers who were at the bar with Osborn; a fight ensued, Osborn was knocked down and severely injured and Dobry and Berkquist left the tavern as did Miss Hrabar and her escort who saw the bartender wipe the blood off Osborn's face with a towel. Osborn went upstairs to his apartment, the police were called, he was taken to a hospital where he was treated and died about 48 hours after he was struck.

Section 14 of the Dram Shop Act provides: "Every . . . wife, child, parent . . . who shall be injured, in person or property, or means of support, by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, of any person, shall have a right of action in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving alcoholic liquor, have caused the intoxication, in whole or in part, of such person; and any person owning, renting, leasing or permitting the occupation of any building or premises, and having knowledge that alcoholic liquors are to be sold therein, or who having leased the same for other purposes, shall knowingly permit therein the sale of any alcoholic liquors that have caused, in whole or in part, the intoxication of any person, shall be liable, severally or jointly, with the person or persons selling or giving alcoholic liquors aforesaid, for all damages sustained, and for exemplary damages."

Paragraph 5 of § 2 of the Dram Shop Act defines "beer" as an "alcoholic liquor."

Counsel for plaintiffs in their brief say: "The only question in the case was whether there was evidence tending to prove that Osborn came to his death in consequence of the intoxication, habitual or otherwise, of any person." We think this is a correct statement of the controlling question. The law is that on a

motion for judgment n.o.v. the court has no power to weigh the evidence and the motion should not be allowed where there is any evidence in the record which, standing alone, tends to prove the material allegations of the complaint even though the court is of opinion that a verdict for the plaintiff, if given, must be set aside as against the preponderance of the evidence. *Libby, McNeill & Libby v. Cook,* 222 Ill. 206. This rule of law has not been changed by the Civil Practice Act. *Thomason v. Chicago Motor Coach Co.,* 292 Ill. App. 104; *Capelle v. Chicago & N. W. Ry. Co.,* 280 Ill. App. 471. The question therefore for decision is, is there any evidence in the record tending to prove that Hope J. Osborn came to his death in consequence of the intoxication of any person who was served with liquor in the defendant Leuffgen's tavern? This is further narrowed by the question whether Osborn came to his death in consequence of the intoxication of Joseph Dobry, Axel Berkquist or of Osborn himself, which was brought about in whole or in part by liquor which they had at the tavern in question.

Counsel for plaintiffs asked the court to call Joseph Dobry as a court's witness because it was claimed he was hostile. This was objected to by counsel for defendants and the objection sustained. He was then called by plaintiffs. He testified that in October, 1938, he had been working ''on the W.P.A.'' but was off duty October 19; that on that evening shortly after midnight he went to Leuffgen's tavern and was there until after the trouble; that he had known Berkquist for about eight years and Osborn for about two years and had never had any trouble with Osborn and had no grudge against him; that while he was in the tavern he drank a bottle of beer and just before the trouble had finished half of a second bottle; that he had had nothing else to drink that night or morning; that Osborn came to the tavern about 25 minutes after the

witness and the three of them were sitting on stools at the bar; that when Osborn came in he asked for a drink; that the bartender would not serve him so he asked for a dice game with Berkquist; that Berkquist invited the witness to have a drink and that he replied he had almost a full bottle and would take another a little later. They started the dice game which broke up in an argument; that they started a second game and Osborn accused Berkquist of cheating; that they got into an argument; that Berkquist walked away followed by Osborn who said: "I ought to knock your block off." That Dobry further testified he stepped between them and said: "No sense of hitting an old man like this. He is old enough to be your father." That Osborn replied: "What are you going to do about it?" "I said, 'Nothing. Why don't you be yourself.' Just one word led to another, and he grabbed me by each wrist and stood me up against the bar and Peter Gilgenberg [the bartender] said, 'Sit down.' I said, 'Let him let go of me.' . . . 'I don't want to argue with this man.' " That Osborn walked away, called Dobry a vile name and made remarks about his wife. After further argument the witness testified that Osborn said: "I ought to give you a good rap." That Dobry weighed about 150 pounds and Osborn about 180 pounds; that Osborn took a punch at him and missed and Dobry then struck him on the nose with his fist; "He struck me and I struck him. He was sitting on the floor. I don't know how he got down on the floor. He struck at me and I struck back. I hit him. I hit him right on the bridge of the nose. I hit him with my fist." The evidence further shows that shortly after that when Dobry and Berkquist left the tavern the bartender was wiping the blood off Osborn's face.

Helen Hrabar testified she lived in the neighborhood and was employed as a saleslady in a department store at 92nd and Cottage Grove avenue; that she had

patronized the tavern and knew Leuffgen, the proprietor, and Gilgenberg, the bartender; that about 12:45 or 1 o'clock on the morning of October 19, she drove to the tavern with Mr. Lefkie in his automobile; that she there saw Dobry, Berkquist and Osborn who were sitting together at the bar with some glasses in front of them, "They had been drinking. At that time they were just sitting there and talking. It was just ordinary conversation." That she and her friend went into a back room, sat down at a table, ordered a drink and were served by the bartender; that they remained there from a half to three-quarters of an hour; while there they heard people talking a little loud. The conversation later got louder; that she heard a scuffle and something fell; that she saw the bartender go into the back room; later he returned with a towel; that she and her escort got up and went into the barroom and there saw Osborn on the floor; that just before they went into the front room they heard a door slam; that when they got there Dobry and Berkquist had gone. Osborn was lying on the floor in the front part near the door, his face was bloody and badly bruised; that the bartender wiped his face with a towel and she and her escort left at that time.

William Lefkie testified he called for Miss Hrabar at her home and took her to the tavern in his automobile; that when they entered the tavern he recognized the bartender, Berkquist, Dobry and Osborn; "I knew Mr. Dobry very well and I knew Pete [the bartender]," that he knew Osborn by sight but had never talked to him; that when he and Miss Hrabar first came to the tavern the three men were at the bar, Dobry had a bottle of beer before him and greeted him, and he and Miss Hrabar went into the back room where they remained for about 45 minutes; that he didn't pay any particular attention to what the three men were doing; that "It seemed to me that Mr. Osborn was slouched over and he appeared to have been

drinking. I didn't notice anything about Mr. Dobry at that time.'' That after they had been sitting in the back room for some time he heard loud talking and thought it was Osborn and Dobry; that he heard dice rolling and from the way they were talking he knew they were arguing about the game; that they finally got into a hot argument and then stopped and then it started again and he heard a commotion ''feet scuffling around . . . they were fighting. . . . I didn't look out, but I did hear the expression 'Polack' and 'my wife.' '' The words were uttered very loudly; that he knew Dobry was very mad; that the altercation quieted down; that the next thing he noticed was the bartender coming out of the washroom with a towel and ''I thought it was time to leave.'' That they got up and left; that Osborn was lying on the floor and the bartender was wiping the blood off his face with a towel; that Osborn had blood all over his face. That he thought the way the bartender acted he (the bartender) had a few drinks; ''I would say he was not entirely sober although I wouldn't say he was intoxicated.'' That after he heard the altercation he and Miss Hrabar went into the barroom to leave and Dobry was at the door just leaving.

Plaintiff Mrs. Osborn, and some of the children testified in substance that about 12:30 or 1 o'clock in the morning of October 20, she was in bed and heard someone at the door—it was her husband who said, ''For God's sake, Mary, open the door.'' That she did so and saw his face was all battered up and blood was all over his face and clothes; that he said he was injured down in the tavern; that it was ''Dibby [Dobry] and his bunch'' who did it. The police were then called and Osborn was taken to the Burnside Hospital; that after receiving first aid he was taken to the Illinois Central Hospital.

Dr. Sanovic testified that Osborn, whom he had not known, was brought to the Burnside Hospital for

emergency treatment in the early morning of October 20; that he had a laceration on the left side of his nose; "deep lacerations at the inner canthus of the right eye and left eye; a fracture of the nose and right and left cheek bones and discoloration that took place." That the doctor gave him first aid and Mrs. Osborn asked that he be taken to the Illinois Central Hospital as he belonged to the employment benefit.

Dr. Carter testified he made an autopsy of the body of Hope Osborn at the Illinois Central Hospital in October, 1938; that Osborn was 46 years old, 5 feet 11 inches tall and weighed about 175 pounds; that he found "fracture at the base of the nose and fracture at the base of the skull." He further testified as to what he found, using long, medical terms which he said meant in plain English that he found a "fracture acoss the base of the nose that extended back into the occipital region, back through the head and base of the skull; that he had a hemorrhage in the back of his head and the hemorrhage was under the scalp, and he had a basal skull fracture, that is to say, a fracture extending across the base of the skull, in addition to the fracture over the face. In my opinion, he died as a result of the fracture of the skull."

We think the question whether the death of Hope J. Osborn resulted from the intoxication of any or all of the three persons who had consumed alcoholic liquor in the tavern was a question for the jury and not for the court. *Dahlberg v. Chicago City Bank & Trust Co.,* 310 Ill. App. 231. It is obvious that no juror or anyone else would believe the testimony of Dobry to the effect that Osborn was struck by Dobry with only his naked fist. Osborn's nose was crushed in, the skull fractured and his teeth knocked out. Of course these injuries were not the result of a blow with the bare fist.

From what we have said it follows that the court erred in entering judgment n.o.v. But since the court failed to pass upon the motion for a new trial,

the cause must be remanded. *Walaite v. Chicago R. I. & P. Ry. Co.*, 376 Ill. 59; *Goodrich v. Sprague*, 376 Ill. 80; *Herb v. Pitcairn*, 377 Ill. 405; *Dahlberg v. Chicago City Bank & Trust Co.*, 310 Ill. 231.

In the latter case where motions for judgment n.o.v. and for a new trial were made and the court passed only on the first motion and failed to pass on the motion for a new trial, we reversed the judgment and remanded the cause with directions to pass upon the motion for a new trial. We there also suggested what we thought was the proper practice where the two motions are made and said: "In the *Goodrich* case [376 Ill. 80] our Supreme Court referred to the case of *Montgomery Ward & Co. v. Duncan*, 311 U. S. 243 where a somewhat similar question was under consideration and said that the Supreme Court of the United States suggested that to prevent delay and unnecessary retrials the court should have passed on *both* motions."

The judgment of the circuit court of Cook county is reversed and the cause remanded with directions to pass upon the motion for a new trial.

*Reversed and remanded with directions.*

McSurely, P. J., and Matchett, J., concur.